**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JOSEPH URBINATI, JR.,**<br><br>              Plaintiff,<br><br>      v.<br><br>**HOWARD LUTNICK**, in his official capacity as Secretary of the United States Department of Commerce; and **NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION**,<br><br>              Defendants. | No. 26-cv-02884 (VSB) (RFT)<br><br>**FIRST AMENDED COMPLAINT** |

## INTRODUCTION

1.      Plaintiff Joseph Urbinati, Jr. is the owner of the M/V Michele My Belle, a vessel that transited along the Atlantic seaboard in November 2022 under the control of a licensed captain.

2.      The transit was uneventful. Nevertheless, the National Oceanic and Atmospheric Administration ("NOAA") imposed a civil penalty of $24,000 on Mr. Urbinati for alleged violations of a federal vessel speed regulation.

3.      That penalty arises from a 2008 rule that limits vessel speeds to ten knots in certain designated areas along the East Coast at specified times of year (the "Speed Rule").

4.      NOAA promulgated that rule under the Marine Mammal Protection Act ("MMPA") and Endangered Species Act ("ESA") to reduce the risk of vessel strikes involving the North Atlantic right whale, an endangered species.

5.      The North Atlantic right whale has been killed by a vessel strike only four times in the ten years between 2009 and 2018, according to NOAA data. During that same period, vessel strikes resulted in only four serious injuries to the species.

6.      The rule imposes substantial operational burdens on vessel owners and operators. It requires vessels sixty-five feet or longer to travel at ten knots or less within designated Seasonal Management Areas that span major portions of the Atlantic seaboard for several months each year.

7.      These restrictions apply regardless of whether any North Atlantic right whales are present, or any risk of harm exists.

8.      At the time of promulgation, NOAA estimated the rule would impose approximately $116 million in annual economic costs on maritime activity.

9.      And in a now-withdrawn proposal, NOAA has since asserted authority to expand the rule significantly—extending speed restrictions along nearly the entire East Coast, lengthening seasonal enforcement periods, and applying the rule to vessels as small as thirty-five feet in length.

10.      NOAA, however, lacked statutory authority to issue the Speed Rule. The relevant statutes authorize regulation of the "take" of protected species—not the imposition of broad, prophylactic restrictions untethered to actual harm. The connection between exceeding a speed threshold and the possibility of a vessel strike is too attenuated to support categorical regulation of this kind. And no provision of the MMPA or ESA provides the clear congressional authorization required for a rule of such sweeping economic and regulatory consequence.

11. Moreover, if the Speed Rule is supported by statute, then the statute delegates legislative power so broad and unconstrained as to violate Article I of the Constitution. Under NOAA's interpretation, the agency may regulate any activity that presents even a theoretical risk to a protected species.

12. Finally, the administrative proceedings that culminated in the civil penalty violated Mr. Urbinati's constitutional rights. NOAA adjudicated Mr. Urbinati's liability in an internal administrative tribunal, where the Administrative Law Judge ("ALJ") declined to consider his statutory and constitutional defenses and increased the penalty beyond NOAA's own initial assessment. That process deprived Mr. Urbinati of his right to an independent adjudication in an Article III court. The constitutional concerns are especially pronounced because NOAA seeks civil penalties arising from alleged conduct on navigable waters, an area long associated with the federal courts' admiralty jurisdiction.

13. Mr. Urbinati was cited by NOAA through a Notice of Violation and Assessment, which he timely challenged through the agency's administrative process. The ALJ, declining to consider Mr. Urbinati's statutory and constitutional defenses, increased the proposed penalty to $24,000. The NOAA Administrator denied review and designated the ALJ's Initial Decision as the final agency action.

14. Mr. Urbinati now seeks judicial review under the Administrative Procedure Act to set aside the agency's final decision and civil penalty on the ground that the Speed Rule is unlawful and its enforcement unconstitutional.

## THE PARTIES

### *Plaintiff*

15.    Plaintiff Joseph Urbinati, Jr. is the owner of the M/V Michele My Belle, a vessel exceeding sixty-five feet in length.

16.    Mr. Urbinati resides in New York and brings this action in his individual capacity.

### *Defendants*

17.    Howard Lutnick is sued in his official capacity as Secretary of Commerce.

18.    National Oceanic and Atmospheric Administration is the federal agency that promulgated and enforces the Speed Rule.

## JURISDICTION AND VENUE

19.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); § 2201 (authorizing declaratory relief); § 2202 (authorizing injunctive relief); 5 U.S.C. §§ 701–706 (judicial review provisions of the Administrative Procedure Act).

20.    Mr. Urbinati has exhausted all available and required administrative remedies.

21.    Venue in the Southern District of New York is proper because Mr. Urbinati resides in this District, and Defendants include United States agencies and officers sued in their official capacities. 28 U.S.C. § 1391(e).

## STATUTORY AND REGULATORY BACKGROUND

22.    Congress enacted the MMPA in 1972 to protect marine mammal species that "are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1).

23.    The MMPA accomplishes its purpose by prohibiting the "taking" of marine mammals, defined as actions that "harass, hunt, capture, or kill" them. §§ 1362(13), 1372.

24.    The MMPA vests the Secretary of Commerce ("Secretary") with authority to issue regulations on the taking of marine mammals, contingent on the evaluation of five factors. § 1373.

25.    The MMPA also empowers the Secretary with the general power to issue "such regulations as are necessary and appropriate to carry out the purposes of" the statute. § 1382(a).

26.    Similarly, Congress enacted the ESA in 1973 to conserve endangered and threatened species. § 1531(a), (b).

27.    The ESA prohibits the "take" of endangered species, defined as actions to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" protected species. §§ 1532(19), 1538(a)(1)(B).

28.    The ESA authorizes the Secretary to promulgate regulations "appropriate to enforce" its provisions. § 1540(f).

29.    The Secretary has delegated his MMPA and ESA rulemaking powers to the NOAA Administrator.

30. In 2008, NOAA, through its sub-agency the National Marine Fisheries Service ("NMFS"), issued a Final Rule To Implement Speed Restrictions to Reduce the Threat of Ship Collisions With North Atlantic Right Whales (the "Speed Rule"). 73 Fed. Reg. 60,173 (Oct. 10, 2008).

31. NOAA issued the Speed Rule under claimed authority from both the MMPA and the ESA. *Id.* at 60,182.

32. The 2008 Speed Rule established seasonal management areas ("SMAs") along the United States Atlantic seaboard. 50 C.F.R. § 224.105(a).

33. The SMAs span sections of the Atlantic seaboard, including areas off the coasts of New England, the Mid-Atlantic, and the Southeast. 50 C.F.R. § 224.105(a); 73 Fed. Reg. at 60,175.

34. The SMAs are active seasonally, with each active for approximately four to five months each year. 50 C.F.R. § 224.105(a).

35. With limited exceptions, vessels that are sixty-five feet in overall length or greater must travel at ten knots or less over ground in active SMAs. *Id.*

36. NOAA justified the rule based on data suggesting that vessel strikes contribute to mortality rates among North Atlantic right whales. 73 Fed. Reg. at 60,174.

## FACTUAL BACKGROUND

37. In November 2022, Mr. Urbinati's vessel, the M/V Michele My Belle, was relocated from New York to Florida for the winter season. The vessel was operated

6

by a licensed captain hired for that purpose. Mr. Urbinati was not aboard the vessel during the transit and did not direct its day-to-day navigation.

38.     Over the course of the voyage, from November 19 through November 21, 2022, the vessel traveled through areas designated by NOAA as Seasonal Management Areas under the Speed Rule. NOAA later alleged that, during portions of that transit, the vessel exceeded the ten-knot speed limit over approximately 283 nautical miles within those areas, including sustained travel at average speeds ranging from approximately fourteen to twenty-four knots.

39.     The transit was otherwise uneventful. The vessel encountered no North Atlantic right whales, and no harm to any protected species was alleged.

40.     On September 14, 2023, NOAA issued a Notice of Violation and Assessment of Administrative Penalty, alleging three violations of the Speed Rule— one for each day of the transit—and assessing a total penalty of $22,500.

41.     Mr. Urbinati timely contested the citation and requested a hearing through NOAA's administrative process. The matter proceeded before an Administrative Law Judge on a stipulated record.

42.     In the administrative proceedings, Mr. Urbinati raised statutory and constitutional challenges to the validity of the Speed Rule, as well as objections to the proposed penalty. The ALJ declined to consider those challenges, concluding that she lacked authority to assess the rule's legality.

43.     The ALJ nevertheless found Mr. Urbinati liable for the alleged violations and increased the penalty to $24,000, citing the severity of the violations

and Mr. Urbinati's asserted responsibility for the vessel's operation, notwithstanding his absence during the transit.

44.     Mr. Urbinati sought further review within the agency. The NOAA Administrator did not grant review within the time permitted, and the ALJ's Initial Decision therefore became the final agency action by operation of law.

### COUNT I: The Citation Should Be Set Aside Because the Speed Rule Exceeds NOAA's Statutory Authority

### (5 U.S.C. § 706(2)(C))

45.     The preceding paragraphs are incorporated herein by reference.

46.     The citation's validity turns on the validity of the Speed Rule.

47.     "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

48.     The Speed Rule is not supported by statute and is therefore invalid.

49.     First, NOAA issued the Speed Rule under 16 U.S.C. § 1382(a) of the MMPA, but the Speed Rule is a take regulation, which may be issued only under the rulemaking procedure of § 1373, which requires specific analyses that NOAA did not complete here.

50.     Second, none of the relevant provisions from the MMPA and ESA authorize prophylactic measures like the Speed Rule. Rather, those provisions permit only regulations of the take of protected animals, not activities that simply might result in take.

51.    Third, even if a relevant provision authorized NOAA to regulate activity that could result in take, that provision authorizes NOAA to issue categorical rules like the Speed Rule only if there is a tight connection between the regulated activity and the possibility of take. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 92–93 (2002). Because that tight connection is missing here, the relevant statutory provision does not authorize the Speed Rule.

52.    Fourth, the major questions doctrine applies, because NOAA's claimed power would allow it to regulate vessels of any size, impose any speed restriction, and designate regulated areas of any size. This is the power to decide whether critical ports, maritime activities, and international trade are permitted to operate, and it is therefore the power to decide a major question.

53.    Despite this, no statute provides a clear statement authorizing NOAA to regulate oceanic speed limits, and the Speed Rule is therefore not supported by statute.

54.    Because the Speed Rule is unlawful, the ALJ's Initial Decision and the civil penalty must be set aside. 5 U.S.C. § 706(2).

### COUNT II: In the Alternative, the Citation Should Be Set Aside Because the Speed Rule's Statutory Authority Violates the Nondelegation Doctrine

### (Article I, Section 1, of the U.S. Constitution; 5 U.S.C. § 706(2)(B), (C))

55.    The preceding paragraphs are incorporated herein by reference.

56.    If the Speed Rule is authorized by the MMPA or ESA, the relevant statutes are so broad and unconstrained as to delegate lawmaking authority in violation of Article I of the Constitution and therefore cannot support the Speed Rule.

9

57.     Article I, Section 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ."

58.     Congress may not "abdicate or . . . transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

59.     The President, acting through his agencies, therefore, may not exercise Congress's legislative power to declare entirely "what circumstances . . . should be forbidden" by law. *Pan. Refin. Co. v. Ryan*, 293 U.S. 388, 418–19 (1935).

60.     Although Congress may confer discretion on agencies, it must supply both an intelligible policy and meaningful boundaries that constrain the agency's exercise of that authority. *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673–74 (2025).

61.     If the MMPA or ESA could be read to authorize the Speed Rule, then the relevant statute provides no intelligible principle to guide NOAA's exercise of prophylactic rulemaking power untethered from actual harm to protected species.

62.     Under NOAA's interpretation, the general rulemaking provisions of these statutes would grant the agency unconstrained authority to forbid any activity on land or sea that creates even a theoretical possibility, no matter how remote, of harming a protected species.

63.     For example, this unconstrained power would permit NOAA to impose speed limits of any restrictiveness on any or all vessels in any waters, as well as other categorical restrictions on ocean activity based solely on a generalized risk to

protected species—power the agency has already effectively claimed in its attempt to expand the Speed Rule.

64.     Such broad statutory authority would lack meaningful limits and would therefore delegate lawmaking authority to the Secretary and NOAA in violation of Article I of the Constitution.

65.     In the absence of a constitutional rulemaking provision, the Speed Rule is unsupported by statute, and the Initial Decision and civil penalty must be set aside. 5 U.S.C. § 706(2).

## COUNT III: The Citation Should Be Set Aside Because NOAA's Administrative Adjudication Violates the Seventh Amendment Right to Trial by Jury

**(Seventh Amendment to the United States Constitution; 5 U.S.C. § 706(2)(B), (C))**

66.     The preceding paragraphs are incorporated herein by reference.

67.     The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

68.     The Seventh Amendment applies to statutory causes of action that are analogous to actions at common law and seek legal remedies. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989).

69.     Actions by the government seeking civil monetary penalties are classic legal actions to which the Seventh Amendment ordinarily applies. *Tull v. United States*, 481 U.S. 412, 418–25 (1987).

11

70.     NOAA seeks to recover a civil monetary penalty against Mr. Urbinati personally.

71.     Because NOAA seeks a legal remedy against Mr. Urbinati personally, this enforcement action is analogous to the common-law action of debt and falls within the Seventh Amendment.

72.     This action does not involve a public right that Congress may assign for final adjudication to an executive tribunal without a jury.

73.     NOAA's administrative adjudication provides no jury trial.

74.     NOAA's adjudication therefore deprives Mr. Urbinati of his Seventh Amendment right to trial by jury.

75.     Because the civil penalty was imposed through an unconstitutional adjudicative process, the agency's final decision and civil penalty must be set aside.

**COUNT IV: The Citation Should Be Set Aside Because NOAA Unconstitutionally Exercised the Judicial Power in Violation of Article III and Admiralty Jurisdiction**

**(Article III, Section 2, of the U.S. Constitution; 5 U.S.C. § 706(2)(B), (C))**

76.     The preceding paragraphs are incorporated herein by reference.

77.     Article III of the Constitution vests the judicial power of the United States in courts whose judges enjoy life tenure and salary protection. That structure safeguards individual liberty by ensuring adjudication before an independent judiciary. *Stern v. Marshall*, 564 U.S. 462, 484 (2011).

78.     The Constitution specifically extends the judicial power to "all Cases of admiralty and maritime Jurisdiction." Art. III, § 2. From the founding, civil

enforcement actions arising from conduct on navigable waters—including penalties tied to vessel operations—were adjudicated in Article III courts exercising admiralty jurisdiction.

79.    This case involves an alleged civil offense arising from the operation of a vessel on navigable waters. It therefore falls within the historical core of Article III admiralty jurisdiction.

80.    Nevertheless, NOAA adjudicated Mr. Urbinati's liability entirely within an internal administrative tribunal. The ALJ (an employee of the Executive Branch) determined liability, imposed a civil penalty, and entered an Initial Decision without the involvement of an Article III court.

81.    Mr. Urbinati was not afforded a trial before an independent judge, nor the protections traditionally associated with adjudication in an Article III court exercising admiralty jurisdiction.

82.    Judicial review of NOAA's decision is limited and deferential, further insulating the agency's determination from meaningful independent review.

83.    This adjudicatory structure deprives Mr. Urbinati of his right to have liability for a maritime offense determined by an Article III court and impermissibly vests the judicial power in the Executive Branch.

84.    At a minimum, Article III requires that liability and the imposition of civil penalties for alleged maritime violations be subject to de novo determination of both law and facts by an Article III court.

13

85.     Because Mr. Urbinati's liability was adjudicated in an unconstitutional forum, the agency's final decision and civil penalty must be set aside.

## REQUEST FOR RELIEF

Plaintiff Urbinati requests the following relief:

(i)     A declaratory judgment holding the ALJ's Initial Decision and civil penalty to be unlawful;

(ii)    A permanent prohibitory injunction (1) setting aside the Initial Decision and civil penalty and (2) forbidding Defendants from enforcing the Initial Decision or civil penalty;

(iii)   An award of reasonable attorney fees and costs, pursuant to 28 U.S.C. § 2412, or any other applicable authority; and

(iv)    Any other relief as the Court deems just and proper.

DATED: July 21, 2026.

Respectfully submitted,

/s/ *Allison D. Daniel*
ALLISON D. DANIEL*
Ohio Bar No. 0096186
*Lead Counsel*
CHARLES M. BRANDT*
D.C. Bar No. 90029325
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (916) 419-7111
Fax: (916) 419-7747
ADaniel@pacificlegal.org
CBrandt@pacificlegal.org

*Attorneys for Plaintiff*

*Admitted pro hac vice*

14